IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
NORTHERN DIVISION

MARKUS JAMAAL RUDOLPH,   :
              :
  Plaintiff,      :
              :
vs.            :
              :  CIVIL ACTION 16-0128-WS-M
CAROLYN W. COLVIN,     :
Social Security Commissioner, :
              :
  Defendant.      :

## REPORT AND RCOMMENDATION

In this action under 42 U.S.C. § 1383(c)(3), Plaintiff seeks judicial review of an adverse social security ruling denying a claim for Supplemental Security Income (hereinafter *SSI*) (Docs. 1, 16).  The action was referred for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B), Fed.R.Civ.P. 72, and S.D.Ala. Gen.L.R. 72.  Oral argument was heard on November 14, 2016.  After considering the administrative record, the memoranda of the parties, and oral argument, it is recommended that the decision of the Commissioner be affirmed and that this action be dismissed.

This Court is not free to reweigh the evidence or substitute its judgment for that of the Secretary of Health and Human Services, *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983), which must be supported by substantial evidence.

1

*Richardson v. Perales*, 402 U.S. 389, 401 (1971).  Substantial evidence requires "that the decision under review be supported by evidence sufficient to justify a reasoning mind in accepting it; it is more than a scintilla, but less than a preponderance." *Brady v. Heckler*, 724 F.2d 914, 918 (11th Cir. 1984), *quoting Jones v. Schweiker*, 551 F.Supp. 205 (D. Md. 1982).

At the time of the most recent administrative hearing, Rudolph was twenty-nine years old, had completed a high school education, though he never passed the exit exam (Tr. 58-59), and had no previous work experience (Tr. 59).  Plaintiff alleges disability due to obsessive compulsive disorder (hereinafter *OCD*) and borderline intellectual functioning (Doc. 18).

Rudolph applied for SSI on September 28, 1992; the Social Security Administration (hereinafter *SSA*) determined that he was disabled, "due to borderline intellectual functioning and attention deficit hyperactivity disorder," and awarded benefits as of September 1, 1992 (Tr. 114).  On July 16, 1999, the SSA notified Plaintiff that it considered him no longer disabled and that his benefits would cease in September 1999 (*see id*.).  On August 21, 2000, that decision was upheld by an Administrative Law Judge (hereinafter *ALJ*).

On January 31, 2008, Plaintiff reapplied for SSI, asserting

he was disabled as of September 1, 2005 (Tr. 127, 372-74).[1]  On
December 11, 2009, an ALJ denied benefits, determining that
Rudolph could do medium, unskilled work (Tr. 127-35).  On
February 11, 2011, the Appeals Council ordered the ALJ to
reconsider the evidence (Tr. 139-42).

On September 21, 2012, an ALJ determined that Plaintiff was
not disabled as he could perform specific light and medium
unskilled jobs (Tr. 146-54, 160-76).  On December 13, 2013, the
Appeals Council remanded the action, deciding that the ALJ had
not properly considered all of the evidence (Tr. 177-80).

On August 7, 2014, a new ALJ, following an evidentiary
hearing, determined that Plaintiff was capable of performing
specific, medium-exertion jobs (Tr. 28-40).  Rudolph requested
review of the hearing decision (Tr. 23-24), but the Appeals
Council denied it (Tr. 1-6).

Plaintiff claims the opinion of the ALJ is not supported by
substantial evidence.  Specifically, Rudolph alleges that:  (1)
The ALJ improperly determined that he did not meet the
requirements of Listing 12.05C; (2) the ALJ's residual
functional capacity (hereinafter *RFC*) assessment is unsupported
by the evidence; (3) the ALJ did not use the correct standard in
evaluating the evidence; (4) the ALJ did not properly explain
the weight he gave the evidence; (5) the ALJ improperly found

---

[1]At the most recent evidentiary hearing, the onset date was
amended to be January 31, 2008 (Tr. 50-51).

his testimony, and that of his mother, non-credible; (6) the ALJ did not develop a full and fair record; (7) the ALJ demonstrated bias in his determination; and (8) the Appeals Council did not properly consider newly-submitted evidence (Doc. 16).  Defendant has responded to—and denied—these claims (Doc. 20).  The Court will now summarize the relevant evidence of record.[2]

Educational records show that Rudolph was initially placed into special education classes in 1995 while in the fourth grade (Tr. 478); further records show he received supplemental teacher assistance with his studies, though he was educated in regular academic classes (Tr. 445, 447, 452).  Reported grades demonstrate that Plaintiff did not fail to receive credit in any of his classes taken from seventh through twelfth grades; his grades in high school reflect a solid C average[3] (Tr. 475-77).  Rudolph did not pass the high school graduation exam, falling short in his reading, language, and science sections; he did pass in math (Tr. 477, 479).

On May 7, 2007, Rudolph went to Cahaba Center for Mental Health with complaints of anxiety, being nervous, a fear of germs, and washing his hands constantly; he had been diagnosed

---

[2]The Court will not review records that pre-date Rudolph's initial asserted disability date of September 1, 2005 and will focus on mental—as opposed to physical—health records.  Furthermore, the Court will not summarize all of the individual therapy session records from Cahaba Center for Mental Health as they provide little useful medical information for the claims brought herein.

[3]GPA's for each term were totaled and divided by the number of terms (19.75/8 equals 2.47 where C equals 2 and B equals 3) (Tr. 502).

with Attention-Deficit/Hyperactivity Disorder (hereinafter *ADHD*) as a child (Tr. 51). On May 23, 2007, Plaintiff was noted to be euthymic with normal concentration, though sometimes sad; insight and judgment were poor (Tr. 556-60). He was taking Paxil[4] and Klonopin[5] though he could not always afford them; the Social Worker said he had depression. Rudolph participated in individual therapy once every three months over the next nine months; there was a note during this period that Plaintiff had not filled a three-month-old prescription (Tr. 553-55). On February 12, 2008, a Doctor noted some improvement in depressive and OCD symptoms overall, though he continued with compulsive hand-washing (Tr. 551).

On April 12, Psychologist Lee Stutts examined Plaintiff who was fully oriented, calm, and cooperative; affect was normal though he described intermittent sadness and being worried (Tr. 565-67). Rudolph exhibited mild anxiety; thoughts were logical and coherent. Memory, judgment, and insight were intact. Stutts estimated Plaintiff's IQ to be average-to-low average, though he had some problems with concentration. The Psychologist went on to state that Rudolph's "ability to understand and to carry out and remember instructions is moderately impaired. The claimant's ability to respond

---

[4]**Error! Main Document Only.***Paxil* is used to treat depression. *Physician's Desk Reference* 2851-56 (52nd ed. 1998).

[5]*Klonopin* is a class-four narcotic used for the treatment of panic disorder. **Error! Main Document Only.***Physician's Desk Reference* 2732-33 (62nd ed. 2008).

appropriately to supervision, coworkers and the public is moderately impaired" (Tr. 567).

On April 29, 2008, Dr. Aileen McAlister, an SSA evaluator rendering opinions based on medical records without the benefit of an examination, completed a Psychiatric Review Technique Form, indicating that Rudolph had an affective disorder as demonstrated by depression with anhedonia or pervasive loss of interest in almost all activities, appetite disturbance with change in weight, sleep disturbance, decreased energy, or difficulty concentrating or thinking (Tr. 571; *see generally*, Tr. 568-81).  Plaintiff also had a personality disorder as evidenced by persistent disturbance of mood or affect (Tr. 575). The Doctor indicated that Rudolph had moderate restrictions in his activities of daily living, social functioning, and in maintaining concentration, persistence, or pace.  McAlister also completed a mental RFC assessment in which she indicated that Plaintiff would have moderate limitations in the following:  his ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from

supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and respond appropriately to changes in the work setting (Tr. 582-85).

Rudolph attended individual therapy counseling sessions at Cahaba in May and July 2008; nothing significant was noted (Tr. 592-93). On February 12, 2009, "rule out mental retardation, unspecified," was added to the diagnosis (Tr. 595).

On March 4, Patrice Donahue, Psychiatrist at Cahaba Center, denied an Ambien[6] prescription request from Rudolph who was having difficulty sleeping; the note further indicated that Plaintiff was not consistent with taking his Klonopin because of the expense (Tr. 613). Rudolph had an individual therapy session on June 5 (Tr. 598). On September 10, Donohue noted that Rudolph stated his obsessive rituals decreased while taking his drugs as instructed; he reported isolating himself and feeling somewhat schizoid, but she noted nothing out of the ordinary (Tr. 612). On September 29, the Doctor completed a mental RFC form indicating that Rudolph was moderately limited in the following: ability to respond to customers, other members of the general public, or customary work pressures; and his ability to use judgment, understand, remember, and carry out complex instructions (Tr. 601-02). Plaintiff was markedly

---

[6] *Ambien* **Error! Main Document Only.** is a class four narcotic used for the short-term treatment of insomnia. *Physician's Desk Reference* 2799 (62nd ed. 2008).

limited in his ability to maintain attention, concentration, or pace for periods of at least two hours.  On January 12, 2010, the Psychiatrist noted no changes from the exam three months earlier (Tr. 611, 621).  On June 30, Rudolph noted increased ritual behavior when stressed; Donohue noted no changes (Tr. 610, 620; *see also* Tr. 624).  On February 24, 2011, Plaintiff noted decreased frequency in hand-washing and checking, but they still interfered with functioning; Dr. Donohue noted that although a prescription for Ambien had been written three months earlier, it had not been filled (Tr. 609, 619; *see also* Tr. 615-16, 623, 626).  Ambien and Geodon[7] were prescribed.  On April 27, in an individual therapy session, Rudolph stated that medications helped him with his OCD and hand-washing (Tr. 614, 622).

On July 19, Psychologist Stutts examined Rudolph who reported being on no prescribed medications; he was oriented in four spheres (Tr. 641-43).  Affect was normal, though Plaintiff seemed immature and dependent on his mother; thoughts were logical and coherent.  Memory, judgment, and insight were intact for his IQ range and developmental level.  Rudolph underwent the Wechsler Adult Intelligence Scale-Fourth Edition (hereinafter *WAIS*-IV) on which he scored a Full Scale IQ of 70 and a verbal comprehension score of 68, placing him in the borderline

---

[7]*Geodon* is used in the treatment of schizophrenia.  **Error! Main Document Only.***Physician's Desk Reference* 2507-09 (62nd ed. 2008).

mentally deficient range and at the 2.0 percentile.  Stutts
thought the test results were valid and Plaintiff's prognosis
fair-to-poor.  The Psychologist diagnosed Plaintiff with the
following:  Obsessive-Compulsive Disorder, Depressive Disorder,
NOS (Provisional), Rule Out Dysthymic Disorder, Rule Out
Asperger's Disorder, Rule Out Social Anxiety Disorder, Parent-
Child Relationship Problem (Father), Rule Out Schizoid
Personality Traits, and Borderline Range of Intellectual
Functioning.  Stutts indicated that Rudolph would not be able to
manage funds, should he be awarded any, and that his "ability to
understand and to carry out and remember instructions [was]
moderately impaired.  The claimant's ability to respond
appropriately to supervision, coworkers and the public [was]
moderately impaired" (Tr. 643).  The Psychologist also completed
a mental RFC evaluation in which he indicated that Plaintiff
would have moderate limitations in his ability to do the
following:  understand, remember, and carry out complex
instructions and interact appropriately with supervisors and co-
workers (Tr. 656-58).  Stutts found Rudolph would be moderately-
to-markedly limited in his ability to make judgment on complex
work-related decisions and respond appropriately to usual work
situations and to changes in a routine work setting.

On August 24, 2011, Psychiatrist Donahue noted that Rudolph
was somewhat guarded and appeared to have difficulty organizing

his thinking; his mother reported that he seemed overmedicated, was becoming more disorganized, and his compulsive rituals were not controlled with the medications (Tr. 662).  Remeron[8] and Haldol[9] were added to his medical regimen.  On October 27 and November 16, Cahaba medical records note that Plaintiff was out of his medications (Tr. 663-64).  Dr. Donahue, on November 16, noted that Rudolph was still somewhat guarded and disorganized, though less than before he started the Haldol (Tr. 661).  On April 11, 2012, the Psychiatrist noted nothing different from previous examinations, but increased his Haldol  (Tr. 667, 691). On August 28, Plaintiff reported that his symptoms were reduced with the medication change (Tr. 670, 690).  On January 16, 2013, Rudolph reported being compliant with his medications, though he had stopped taking the Remerol because it made him feel "out of it;" symptoms, otherwise, were reduced with the medications (Tr. 688).  On July 30, Psychiatrist Donahue's records note nothing in particular (Tr. 686).

A medical record entry, on July 29, 2013 from Dr. Roseanne Cook's office, had Plaintiff reporting that he could not afford all of his medications (Tr. 675).  On November 6, Dr. Cook noted Rudolph was oriented in four spheres and had normal judgment, but poor insight; the physical exam was recorded as normal (Tr.

---

[8]*Remeron* is used to treat major depressive disorders. http://www.drugs.com/remeron.html
[9]*Haldol* is an antipsychotic medication used to treat mood disorders such as schizophrenia and schizoaffective disorders. http://www.webmd.com/drugs/2/drug-5419/haldol-oral/details

679-81).  On December 18, the Doctor noted a normal exam (Tr. 676-78).

On February 18, 2014, Psychiatrist Donahue noted no changes in Rudolph's exam or treatment (Tr. 696-99).

On February 17 and March 14, Dr. Cook noted normal examinations (Tr. 705-09).

On February 9, 2016, Ann Dominick, Ed.D., wrote a "To Whom It May Concern" letter, stating that Rudolph had taken a test that did not truly measure his IQ but the scores placed him in the borderline range of intelligence and in the lowest two percentile of the population, intelligence-wise (Tr. 710; *see also* Doc. 17, pp. 5-8).

At the most recent evidentiary hearing, Plaintiff testified that he lived with his mother and had for a long time (Tr. 53-56).  He had a learner's driver's permit that was about to expire and had graduated from high school, though he had not passed the exit exam (Tr. 57-59).  Rudolph had never worked and did not think that he could because of his OCD and depression; he admitted that he had never applied for a job and had never sought training through Vocational Rehabilitation (Tr. 59-61).  Plaintiff testified that his daily activities included exercising, running, cleaning, and vacuuming; he indicated that he did not have physical limitations that would prohibit his working (Tr. 61-62).  Medications helped with his depression and

11

caused no side effects; he did not have memory problems (Tr. 62-63).  Sometimes, Rudolph had problems understanding and staying focused; washing his hands constantly was a problem (Tr. 63).

Plaintiff's Mother testified that Rudolph had lived with her his whole life, though the two of them had lived with her mother when he was a baby (Tr. 64-65).  She stated that her son bathed five or six times a day and washed his hands constantly; this behavior embarrassed him, causing him to keep to himself, even at places like church (Tr. 66-67).  The Mother said that Rudolph had sought vocational services, but he had been rejected from the program; he played games a lot (Tr. 68-69).  Plaintiff could go to the grocery store and shop with a list and could do things around the house though it was a struggle to get him to do them (Tr. 70).

This concludes the Court's summary of the record evidence.

Rudolph first claims that the ALJ improperly determined that he did not meet the requirements of Listing 12.05C (Doc. 16, pp. 6-10).  The introductory notes to Section 12.05 state that "[i]ntellectual disability refers to a significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the development period; *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22."  20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 12.05 (2016).  Subsection C requires "[a]

valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function."  20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 12.05C.

The Court notes that although the regulations require that Plaintiff demonstrate he suffered "deficits in adaptive behavior" before he turned twenty-two, the Eleventh Circuit Court of Appeals, in *Hodges v. Barnhart*, 276 F.3d 1265, 1266 (11th Cir. 2001), held "that there is a presumption that mental retardation is a condition that remains constant throughout life."  The *Hodges* Court further held "that a claimant need not present evidence that []he manifested deficits in adaptive functioning prior to the age of twenty-two, when []he presented evidence of low IQ test results after the age of twenty-two." *Hodges*, 276 F.3d at 1266.  However, the presumption is rebuttable.  *Hodges*, 276 F.3d at 1267.

Rudolph first argues that the ALJ did not even consider the possibility of Listing 12.05C, though later acknowledging that the ALJ considered—but rejected—12.05C factors; Plaintiff disagreed with his reasons, arguing that he had been specially educated through high school and had not received a diploma (Doc. 16, pp. 6-9).  Rudolph points to the WAIS-IV results on which he scored a Full Scale IQ of 70 and a Verbal IQ score of 68, placing him in the borderline mentally deficient range and

at the 2.0 percentile (Tr. 642).

In his determination, the ALJ specifically noted that Plaintiff did not meet or equal the requirements of Listing 12.05C or any other Listing (Tr. 31-33). The ALJ noted the low IQ scores, but wrongly stated that Psychologist Stutts was the only evaluator to find Rudolph to function with borderline intelligence (Tr. 33; *cf.* 642); Plaintiff correctly notes that Non-Examining Medical Expert Doug McCann[10] and Educator Dominick[11] reached the same conclusion (Tr. 104, 710).

Borderline intelligence, however, is not mental retardation. As noted by one of our sister district courts, "[a] borderline intelligence level generally means that the IQ exceeds 70." *Geier v. Astrue*, 2008 WL 553611, *3 (N.D. Florida February 28, 2008) (*citing Turner v. Crosby*, 339 F.3d 1247, 1276 n. 21 (11th Cir.2003) (IQ of 72 indicates borderline intelligence), *cert. denied,* 541 U.S. 1034, 124 S.Ct. 2104, 158 L.Ed.2d 718 (2004).

In this action, no examining—or non-examining source—diagnosed Rudolph to be mentally retarded,[12] the focus of Section

---

[10]McCann testified at the first of three evidentiary hearings at the administrative level; the Court has not summarized that evidence. The Court notes, though, that McCann did not find mental retardation and did not discuss Listing 12.05C in his testimony (Tr. 103-06).

[11]The Court notes, however, that the ALJ did not have Dominick's opinion as it came eighteen months after his decision was entered.

[12]On September 3, 2013, the SSA "replaced the term 'mental retardation' with 'intellectual disability' in Listing 12.05, but the change did not affect the substance or requirements of the Listing." *McClung v. Colvin*, 2016 WL 4943070, *10 n.8 (N.D. Ala. September 16,

12.05C.  Stutts's first exam did not include testing, but the Psychologist found Plaintiff to have average-to-low average intelligence (Tr. 566); he changed the diagnosis following testing (Tr. 642).  However, in all of the treatment records from Cahaba, no one, including Psychiatrist Donahue, indicated that Rudolph was disabled because of mental infirmity; in fact, one record note ruled out mental retardation (Tr. 595).  Nevertheless, the failure of a diagnosis is only one point of consideration here.

The ALJ also rejected a Listing finding because of Rudolph's activities of daily living as he had indicated that he could independently perform household chores and care for his personal needs (Tr. 31-32, 38).  Plaintiff testified that daily activities included exercising, running, cleaning and vacuuming; he indicated he did not have physical limitations that would prohibit his working (Tr. 61-62).  The record also shows that Rudolph sat with—and cared for—an ill grandfather who was dependent upon him (Tr. 443, 566).  He liked playing basketball, could go to entertainment venues and church, and play video games (Tr. 443).  The ALJ noted that some activities showed Rudolph was not bound by his germ-avoidance concerns and found that he was not as limited, socially, as asserted (Tr. 32).

The Court finds that the ALJ's determination that Rudolph

---

2016) (*citing* Change in Terminology:  "Mental Retardation" to "Intellectual Disability," 78 Fed.Reg. 46,499, 46,501 (Aug. 1, 2013)).

did not meet the requirements of Listing 12.05C is supported by substantial evidence.  Though IQ scores required consideration of Plaintiff's intellectual functioning, examiners found that he functioned with borderline intelligence.  The ALJ found Plaintiff's daily activities, social functioning, and educational records demonstrated that he was not mentally retarded and did not meet the requirements of Listing 12.05C. The Court finds that the ALJ's rebuttal of *Hodges* is supported by substantial evidence.  Rudolph's claim otherwise is without merit.

Plaintiff next claims that the ALJ's RFC assessment is unsupported by the evidence.  Rudolph has more specifically challenged his RFC finding that he could concentrate for an extended period of time (Doc. 16, pp. 12-13).

"The RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities."  Social Security Ruling 96-8p, *Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims*, 1996 WL 374184, *3.  The Court notes that the ALJ is responsible for determining a claimant's RFC. 20 C.F.R. § 416.946 (2015).  That decision cannot be based on "sit and squirm" jurisprudence.  *Wilson v. Heckler*, 734 F.2d 513, 518 (11th Cir. 1984).  However, the Court also notes that the social security regulations state that Plaintiff is

16

responsible for providing evidence from which the ALJ can make an RFC determination.  20 C.F.R. § 416.945(a)(3).

Here, the ALJ found that Rudolph could do the following:

> [P]erform a full range of work at all exertional levels but with the following nonexertional limitations:  On a function-by-function basis, the claimant cannot tolerate exposure to dangerous machinery or unprotected heights.  During a regularly scheduled workday, or the equivalent thereof, individual can understand and remember short and simple instructions, but is unable to do so with detailed or complex instructions.  He can [sic] simple, routine, repetitive tasks, but is unable to do so with detailed or complex tasks.  He should have no more than occasional, casual contact with the general public, and casual contact with co-workers.  He can accept constructive non-confrontational supervisor criticism.  He can deal with changes in work place, if introduced occasionally and gradually, and are well-explained.  He would need to be reminded of tasks two times per shift.

(Tr. 33-340).  In further discussion of the RFC, the ALJ found that "Claimant's activities, including playing video games, shows the Claimant is capable of performing such tasks and concentrating for an extended duration" (Tr. 35).

The Court finds no error in this specific conclusion. Though the ALJ only referenced video games, the evidence shows that Rudolph saw movies, played basketball, exercised, and went to church, activities that require concentrating for extended

periods of time.  The undersigned finds that Plaintiff's claim
that the ALJ did not properly assess his RFC is without merit.

   Rudolph next claims that the ALJ did not use the correct
standard in evaluating the evidence (Doc. 16, p. 11).  More
specifically, he objects to the statement that the ALJ found "no
credible and convincing indication [that Plaintiff's abilities
to perform certain work tasks] have been impaired to a disabling
degree by his mental impairments" (Tr. 31).

   The undersigned finds no merit in this claim.  In the cited
passage, the ALJ is stating that he rejected the opinions, as
non-credible, of some examiners who had stated that Plaintiff
could not perform certain tasks.  Later in the determination,
the ALJ specifically set out what he rejected in those
examiners' opinions.  The Court will now review those
credibility conclusions as Rudolph asserts they are incorrect.

   As noted, Plaintiff claims the ALJ did not properly explain
the weight he gave to the evidence (Doc. 16, pp. 10-11).  The
ALJ is required to "state specifically the weight accorded to
each item of evidence and why he reached that decision." *Cowart
v. Schweiker*, 662 F.2d 731, 735 (11th Cir. 1981).  Furthermore,
social security regulations provide the following instruction:

>        It is not sufficient for the
> adjudicator to make a single, conclusory
> statement that "the individual's allegations
> have been considered" or that "the
> allegations are (or are not) credible."  It

> is also not enough for the adjudicator
> simply to recite the factors that are
> described in the regulations for evaluating
> symptoms.  The determination or decision
> must contain specific reasons for the
> finding on credibility, supported by the
> evidence in the case record, and must be
> sufficiently specific to make clear to the
> individual and to any subsequent reviewers
> the weight the adjudicator gave to the
> individual's statements and the reasons for
> that weight.

SSR 96-7p (Policy Interpretation Ruling Titles II and XVI:
Evaluation of Symptoms in Disability Claims:  Assessing the
Credibility of an Individual's Statements).

The Court finds Rudolph correct in noting inconsistent
findings by the ALJ.  The ALJ, in one place gave significant
weight to the conclusions of Psychologist Stutts (Tr. 35) while
giving little weight to them later in the decision (Tr. 38).

While the Court cannot explain the inconsistency, it is
apparent that the ALJ adopted the Psychologist's opinion that
Rudolph could not understand and remember complex instructions
(Tr. 643; *cf.* Tr. 34).  Stutts further indicated Plaintiff would
be moderately impaired in interacting appropriately with
supervisors and co-workers (Tr. 643, 657); the RFC restricts him
to casual contact with co-workers and constructive non-
confrontational supervisor criticism (Tr. 34).  The undersigned
notes that Plaintiff has not pointed to any finding, about his
ability to work, by Stutts that has been given short shrift in

the ALJ's decision (*see* Doc. 16, pp. 10–11).

Plaintiff also complains that the ALJ improperly found that Non-Examiner McAlister's opinions were entitled to great weight (Doc. 16, pp. 10–11).  Rudolph argues that the conclusions by McAlister were six years old by the time the ALJ's decision was entered and failed to consider all of the evidence that had come into the record during the intervening period.

The Court rejects this argument, noting that it cannot re-weigh the evidence.  Furthermore, it is not necessary that each examining—or non-examining—source have access to all medical evidence that pre-dates that particular evaluation; what is required is that the ALJ consider all of the evidence and render a decision that is supported by a substantial amount of it.  The undersigned finds that Rudolph has not demonstrated that the ALJ failed to state the weight given the evidence of record.

Plaintiff claims the ALJ improperly found his testimony, and that of his mother, non-credible.  Rudolph specifically calls out the ALJ for not citing support for finding that Plaintiff did not take his medications regularly and takes issue with the ALJ's finding that no objective evidence supported the limitations claimed (Doc. 16, p. 13–15).

In his decision, the ALJ found Rudolph's and his Mother's allegations of limitations were less than credible (Tr. 34, 36). The ALJ noted that the Psychiatrist's records did not support

the claims (Tr. 35), that Plaintiff's own activities belied his assertions, (Tr. 35, 37, 38), and that his failure to take his medications resulted in a worsening of symptoms (Tr. 37).

The following summary of the evidence relates the following regarding Rudolph's medication regimen. On May 23, 2007, a medical note from Cahaba states that Plaintiff did not always have his medications because of an inability to pay for them (Tr. 560); the prescriptions written on that day were not filled three months later (Tr. 554). On March 4, 2009, Psychiatrist Donahue noted that Plaintiff was not consistent with taking his Klonopin because of the expense (Tr. 613). On September 10, 2009, Donohue noted that Rudolph stated his obsessive rituals decreased while taking his drugs as instructed (Tr. 612). On February 24, 2011, Plaintiff noted decreased frequency in hand-washing and checking, but they still interfered with functioning; Dr. Donohue noted that although a prescription for Ambien had been written three months earlier, it had not been filled (Tr. 609, 619; *see also* Tr. 615-16, 623, 626). On April 27, 2011, Rudolph stated that medications helped him with his OCD and hand-washing (Tr. 614, 622). On July 19, 2011, Psychologist Stutts examined Rudolph who reported being on no prescribed medications (Tr. 641-43). On October 27 and November 16, 2011, Cahaba medical records note that Plaintiff was out of his medications (Tr. 663-64). On August 28, 2012, Plaintiff

reported that his symptoms were reduced with the medication change (Tr. 670, 690).  On January 16, 2013, Rudolph reported being compliant with his medications, though he had stopped taking the Remerol because it made him feel "out of it;" symptoms, otherwise, were reduced with the medications (Tr. 688).  A medical record entry, on July 29, 2013 from Dr. Cook's office, had Plaintiff reporting that he could not afford all of his medications (Tr. 675).

The undersigned set out the above summary to show that the ALJ was correct in stating that Rudolph did not always take his medications as prescribed; the record clearly demonstrates that. While poverty was one factor in that failure,[13] the evidence shows that Plaintiff's ritualistic behavior was diminished when he followed a prescribed medicinal regimen.  To repeat this in different terms:  The objective evidence, *i.e.*, the medical evidence, shows that Rudolph's impairments were less severe when he took his medications.  The Court finds substantial support for the ALJ's conclusion that Plaintiff's—and his Mother's—testimony was not fully credible.

---

[13]The Eleventh Circuit Court of Appeals has held that poverty excuses noncompliance with medical treatment. *Dawkins v. Bowen*, 848 F.2d 1211, 1213 (11th Cir. 1988).  However, as noted by our sister Court, "a claim of financial inability to obtain prescribed treatment is only a justifiable cause for failure to follow the prescribed treatment when free community resources are unavailable." *Bulger v. Colvin*, 2014 WL 4495220, *10 (M.D. Ala. September 12, 2014).

Herein, Rudolph challenged the ALJ's finding that he did not take his medications regularly rather than acknowledging it and asserting a defense of poverty.  As such, Plaintiff's claim lacks merit.

Rudolph next claims that the ALJ did not develop a full and fair record. Plaintiff asserts that because the ALJ did not ask him how often he washed his hands or how long he took to do it, the record is incomplete (Doc. 16, p. 15). The Eleventh Circuit Court of Appeals has required that "a full and fair record" be developed by the ALJ even if the claimant is represented by counsel. *Cowart v. Schweiker*, 662 F.2d 731, 735 (11th Cir. 1981).

At the evidentiary hearing, Rudolph's Mother testified that her son was preoccupied with washing his hands and being germ-free, to the point of taking five or six baths a day (Tr. 66). Because of this, it took him a very long time to complete any chores as he spent so much time cleaning up (Tr. 66-67). The evidence Rudolph claims the ALJ should have gathered was already in the record. His claim otherwise is without merit.

Plaintiff next claims that the ALJ demonstrated bias in his determination. Rudolph goes on to assert that the ALJ had a "plan" to deny benefits because he was less than thirty years old; the "plan" was one in which the ALJ ignored the law and cherry-picked the evidence so that the result the ALJ wanted would be reached (Doc. 16, p. 16-17). In oral argument before the Court, when asked what was the basis for alleging bias, Plaintiff's Attorney stated that the ALJ's bias was demonstrated in that the decision was "wholly unfavorable" to his client or,

23

as stated by the Court but agreed to by the Attorney, the "total tenor of this decision demonstrated bias" (Doc. 26, Audio File at 11:42 — 12:57).

The Supreme Court has held that Administrative Law Judges are presumed to be unbiased, though "[t]his presumption can be rebutted by a showing of conflict of interest or some other specific reason for disqualification;" the burden of disqualification falls on the party making the assertion. *Schweiker v. McClure*, 456 U.S. 188, 195-96 (1982).

Plaintiff's claim that the ALJ was biased is based on the claims, raised herein, in which Rudolph asserts error.  The undersigned has examined six claims and found substantial evidence to support the ALJ's conclusions.  The undersigned has not found any indication of bias in the ALJ's findings, in his methodology, or in his conclusions.  Rudolph's claim of bias is without merit.

Finally, Plaintiff claims that the Appeals Council did not properly consider newly-submitted evidence (Doc. 16, p. 3; Doc. 17).  Rudolph specifically objects to the Appeals Council's failure to include Dr. Dominick's resume along with the evidence she provided regarding Plaintiff's mental abilities (*see* Doc. 17, pp. 8-12).  The Court has already summarized the February 9, 2016 letter Dominick penned for Rudolph (Tr. 710).

The Court notes that a disability claimant can present new

evidence at any stage of the administrative proceedings.  20
C.F.R. ¶ 416.1400(b); *Ingram v. Commissioner of Social Security*,
496 F.3d 1253, 1261 (11th Cir. 2007).  If the evidence is first
presented to the Appeals Council, the Council considers it only
if it relates "to the period on or before the date of the
[ALJ's] hearing decision."  20 C.F.R. § 416.1470(b).  If the
Appeals Council determines that the evidence provides no basis
for changing the ALJ's decision, no further explanation is
required.  *Mitchell v. Commissioner*, 771 F.3d 780, 783–85 (11th
Cir. 2014).  This rule of law was reinforced in an Eleventh
Circuit Court of Appeals decision that stated as follows:

> "The Appeals Council may deny or dismiss [a]
> request for review. . . ."  20 C.F.R. §
> 416.1467.  But the Appeals Council is not
> required to make specific findings of fact
> when it denies review.  It need only
> "consider the additional evidence" that is
> new, material, and chronologically relevant.
> *Id.* § 416.1470(b).  The Appeals Council
> stated that it considered the new evidence
> that Parks submitted, and the Appeals
> Council added the evidence to the record.
> The Appeals Council was not required to do
> more.

*Parks ex rel. D.P. v. Commissioner, Social Security
Administration*, 783 F.3d 847, 853 (11th Cir. 2015).

Here, the Appeals Council considered the new evidence and
found that it provided no basis for changing the ALJ's decision
(Tr. 2).  The Court notes that the evidence not included in the

record by the Appeals Council consists of Ann Dominick's resume, including her education, professional experience, work as an educational consultant, related experiences, community involvement, selected presentations, selected publications, honors and awards, and professional organizations (Doc. 17, pp. 8-12).  While this resume would inform the reader of Dominick's qualifications to provide an opinion as to Rudolph's mental abilities, the Court cannot say that its exclusion was anything more than harmless error.

The Appeals Council did consider and include in the record Dominick's "To Whom It May Concern" letter (*see* Tr. 710).  Though the letter locates Rudolph's intelligence in the lowest two percent of the population, it acknowledges that the test used "is not considered a true IQ score" (Tr. 710).  It finds that Plaintiff has borderline intelligence, but not that he is mentally retarded.  Plaintiff's claim that the Appeals Council did not properly consider this new evidence is without merit.

Rudolph raised eight different claims in bringing this action.  All are without merit.  Upon consideration of the entire record, the Court finds "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Perales*, 402 U.S. at 401.  Therefore, it is recommended that the Secretary's decision be affirmed, *see Fortenberry v. Harris*, 612 F.2d 947, 950 (5th Cir. 1980), that

this action be dismissed, and that judgment be entered in favor of Defendant Carolyn W. Colvin and against Plaintiff Markus Jamaal Rudolph.

<u>NOTICE OF RIGHT TO FILE OBJECTIONS</u>

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to this recommendation or anything in it must, within fourteen (14) days of the date of service of this document, file specific written objections with the Clerk of this Court.  *See* 28 U.S.C. § 636(b)(1); FED.R.CIV.P. 72(b); S.D. ALA. L.R. 7(c). The parties should note that under Eleventh Circuit Rule 3-1, "[a] party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions if the party was informed of the time period for objecting and the consequences on appeal for failing to object. In the absence of a proper objection, however, the court may review on appeal for plain error if necessary in the interests of justice."  11th Cir. R. 3-1.  In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and

specify the place in the Magistrate Judge's report and recommendation where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the Magistrate Judge is not specific.

DONE this 17th day of November, 2016.


s/BERT W. MILLING, JR.
UNITED STATES MAGISTRATE JUDGE